December 2013, 1673, Daniel Rouster v. Secure Care Incorporated et al. I'm going to associate 15 minutes to the plan, 15 minutes to be shared by the defendants. Mr. Desmond, please come. Good morning, Your Honors. Christopher Desmond on behalf of the estate of Jerry Rouster, the plaintiff in this matter. Judge Moore, I'd like to reserve three minutes for rebuttal time, please. Your Honors, as you're aware, this case involves two different issues that we've presented on appeal. The first issue relates to our allegations of deliberate indifference regarding the three individual defendants who were each medical providers within the Saginaw County Jail. The second issue is essentially a Monell claim, which is a municipal liability claim, despite the fact that there's not really a municipality involved in this case, but it's the same analysis that applies to a medical provider within the context of a jail setting. My preference is to begin by speaking regarding the deliberate indifference issue. With deliberate indifference, as you're aware, Your Honors, there's two separate components of a deliberate indifference claim. The first is an objective component, and the second is a subjective component. Now, in the present case, the only component that's really at issue is that second component, the subjective component. Defendants didn't really dispute the existence of the objective component below, nor did the trial court rule on the existence of the objective component. But just very quickly, the objective component requires showing that there's a sufficiently serious medical need that the plaintiff is suffering or in need of. In this case, there's really not much of a dispute considering that. It's not the question of whether or not there is a significant need. Isn't it a question of what is obvious or what is apparent to the defendants? I mean, there surely was a need here. Correct, Judge Cook. That's not the question. To an extent, that's a little bit of an overlap between the objective and the subjective components. The subjective component speaks to whether or not these particular defendants had the facts that they needed to make the inference that there was a need, whether or not they actually drew that inference, and whether they then disregarded that. Because we know there's a need. Right. Exactly. So there is a need exhibited by the fact that, unfortunately, he passed away. He's arrested, what, on May 7th? Correct, Your Honor. When does he go before the municipal judge or the judge for the first time? I believe that was on May 8th. Was he reflecting any symptoms at that time? No, Your Honor. He was not. Reflecting any alcohol withdrawal symptoms at that time? No, Your Honor. He was not. Was he intoxicated when he was arrested on May 7th? He was not, Your Honor. The arresting officer noted that there was no evidence of the influence of alcohol at the time of his arrest. So his first problems start when, sometime around May 9th? May 9th, in the evening of May 9th, approximately 8 o'clock p.m. So he's already been in jail or under incarceration for more than two days? Correct, slightly less than two days. Was there any evidence from your expert or otherwise as to when alcohol withdrawal symptoms manifest itself? I don't believe there was, Your Honor, and that's because the position of our experts was that the symptoms that he was exhibiting didn't have anything to do with alcohol withdrawals. Their focus became when evidence of sepsis, because he was septic at the time of the events at issue in this case, when those symptoms would exhibit themselves. And that they would be distinguishable from the other theories that apparently were going around the jailhouse? Correct, that the symptoms of what he was actually suffering from were at least somewhat distinguishable from the symptoms of alcohol withdrawal, which is what these defendants concluded that Jerry Rouster was suffering from. Wasn't that crucial then for you? I'm sorry, Your Honor, wasn't what crucial? If alcohol withdrawal symptoms typically manifest themselves within six hours, did you have any record evidence saying that they could not subjectively believe it was alcohol withdrawal based upon the medical record in this? Your Honor, I believe the best evidence for that is in regard, and this is what I think Judge Cook was intimating at, the evidence regarding the abdominal pain that Jerry Rouster was suffering from, and this was the first symptom that he complained of at approximately 8 o'clock p.m. on May the 9th. Is this with alcohol withdrawal? No, the abdominal pain is not. But the defendants treated that. They didn't ignore it. You would argue that they essentially ignored it, Your Honor, for all intents and purposes. I thought that some medication was given to help address it, and it may not have been the right thing, but he was given something for an antacid, I thought. Correct, he was provided with an antacid. The case law indicates that you don't need to show that you were literally ignored as a plaintiff or as an inmate your medical needs in order to satisfy the subjective component. I believe our brief cites to the Westlake case for that proposition, for the Lamarb case, which, Judge Moore, I believe you were on the panel of. Right, but the concern is what is there to show that there was a subjective understanding that he had a more serious problem when the aide, I guess Conley, was the person at first who gave him tums and told him to lie in a certain way? So I'd say to a couple different portions of the record, Your Honor. First would be the testimony of Officer Gomez, which I believe the trial court erroneously concluded that we were solely relying on Officer Gomez's testimony. That's not the case. It's certainly a portion of our argument, and that's because Officer Gomez testified, and he used the specific word, that it was obvious that Jerry Rouster needed more medical care than what he was receiving, and he further testified that it appeared that Jerry Rouster was really sick during the events at issue. But when does that testimony pertain to? Does that pertain to the initial treatment decision? We'll put treatment in quotes. The initial treatment decision to give him tums and tell him how to lie. I believe Officer Gomez's interaction with Jerry Rouster would have began at the time that he was moved into the observation cell, which would have been in the early morning hours of May the 10th, between 2 o'clock a.m. and 3 o'clock a.m. on May the 10th. So Conley sees him what time, sometime around 8 or 9? 8.20 p.m. is when she has her first interaction. On May? May the 9th. And when does he start drinking from the toilet? That's approximately 1 o'clock a.m. Between 1 o'clock and 2 a.m. is when? About four hours later. Yes, correct. And in the meantime, prior to him drinking from the toilet, and, again, this is, as the record shows, this is a communal cell, there's approximately 15 other inmates in the cell with him using the toilet he's drinking from. So he's eating off the floor? He's eating their discarded food off of the floor, and prior to that he was vomiting, which Nurse Conley was aware of. Now, our expert witnesses, we have three expert witnesses involved in this case. We have two physicians. We have Dr. Goldenson, who's our jail physician expert. He's testified that the abdominal pain that Jerry Rouster was suffering from required Conley to refer him to a doctor. So is Conley told about the drinking from the toilet and eating food that's on the floor? Yes, Your Honor. But then she had him moved to the observation cell upon hearing that, right? Correct, after hearing that he was drinking from the toilet. Not after hearing about the discarded food, but after hearing that he was drinking from the toilet. At that point she concluded. That's probably enough. Yeah, at that point she concluded. And she's got some interesting testimony regarding that issue, where she indicates that as a medical professional you can't rely on the observations of a third party. So she says that I didn't take further action right away because these reports about his bizarre behavior are coming from guards and are coming from inmates, but I didn't actually see them. So when I heard he was drinking from the toilet, I decided to move him to an observation cell so I could closely see him. What's his blood pressure when he's admitted? Your Honor, I'm not sure what it is when he was admitted. I thought it was 140 over 100. I don't believe that's when he was admitted, but that is when he was taken to the observation cell, and I think when they conducted the first alcohol withdrawal testing. Yes, he was at 140 over 100. Okay. I mean, was that a concern? Apparently for them it was not. Does your doctor say that's some indication of the stomach ulceration? Your Honor, to be frank, I'm not sure if there's that connection. I think the record will show whether there was or not. I don't know if our experts testified regarding the blood pressure. Their focus was more regarding the abdominal pain and the mental status change. So he gets the alcohol test, right? Correct. And it's somewhat on the low end, but it's in the middle range. The alcohol withdrawal test? Right. Actually, Your Honor, he tested at a 15. Actually, I think if you add it up, it's 13. I think they've miscalculated. Okay, they may have miscalculated. I believe the testimony, and I think this was Dr. Natoli, the physician, and I could be wrong on that pronunciation. I apologize. But I believe he testified that had Jerry Rouster had one point higher, he would have been immediately taken to a hospital for an outside evaluation. He had two follow-up alcohol tests, right? Yes. What were those scores? His scores lowered, I believe, to a 4 in the second test, and then in the third test they raised to a 6. But this was after he was given some medication that was supposedly for alcohol withdrawal? Librium, Your Honor, yes. And that is an alcohol withdrawal medicine, is it? Yes. It didn't do anything to treat the abdominal issues that he was having. But, yes, it's intended, I believe, to take away from the tremors and the shakes that people experience, the anxiety that they experience during alcohol withdrawals. Judge Gwynne, regarding your question about his initial scoring, it's interesting that, you know, I don't know how the scoring accounts for this, but one of the questions that the alcohol withdrawal tests ask is whether or not they're disoriented regarding the date. And they ask you to score the individual if they're disoriented by two days or more. He was disoriented by, I believe, eight years. This was 2007, and he was insisting it was 1999. Now, that's consistent with the mental status change that he had been exhibiting throughout, which our nursing expert, Nurse Tennyson, has said required Dr. Natoli to be involved. She indicated that registered medical assistant Conley had a duty to contact Dr. Natoli right when she observed the initial evidence of mental status change, which was the drinking out of the toilet, the eating the discarded food. That evidence, of course, carries forward to Nurse Mars and Nurse Menchaca because they were aware and they were informed of all of the behaviors that had been, you know, taking place within Jerry Rouster's cell. Your Honors, I see that my time is up, so I'm going to reserve the rest of my time for rebuttal unless you have further questioning at this point. Thank you. Thank you. Good morning. May it please the Court, Susan Szybkowski on behalf of Defendants Secure Care, Mars, and Menchaca. Myself and co-defendants counsel are splitting this 50-50. In response to a series of questions from Judge Gwynne, I'd like to make some corrections in the factual record. At the time of Jerry Rouster's arrest, the arresting officer testified he was not falling down drunk. The record then reflects that this officer makes the distinction between falling down drunk and otherwise intoxicated. Well, when he came under the nurse's care, didn't they fill out an initial assessment that he didn't give any manifestations of alcohol? That is not correct. He was initially admitted with a booking form. Now, Mr. Rouster had been arrested several weeks earlier. In fact, I think less than two weeks. And he gave the history at that time, and of course this would have been available to the medical staff, that he was intoxicated and drank at least one to two beers a day. At the time the booking evaluation was made, and this individual was never deposed, the box intoxicated is marked. Both the arresting officer and Conley, who had done admissions, testified that this question is typically asked of the individual. Are you intoxicated? We don't know what the individual who did the booking evaluation asked, but the box is marked intoxicated. Secondly, the only individual that was asked the following question. And that information is available to the defendant nursing staff. Yes. The only individual in this case that was asked, when does alcohol withdrawal symptoms start, was Stella Michalka. Stella Michalka, who is in her deposition, spent 20 years on a veterans rehab floor, says 48 to 72 hours later. So two days before symptoms is not inconsistent. In fact, Valerie Tennyson, plaintiff's expert, admitted it was not only reasonable to observe Mr. Roster, but that the nursing staff should. What do you say? Not reasonable to observe. For alcohol withdrawal symptoms. I mean, the scores he gave, he gives a 13, not a 15, right? That's correct. And 10 to 20, below 10 is not alcohol withdrawal. 20 and above is alcohol withdrawal, right? And 10 to 20 is kind of in the mid-range, may or may not be. It's not a diagnostic test. A CEWA is an evaluation of how severe the symptoms are. It isn't a yes-no, this is alcohol withdrawal or not, which is why Laura Mars, who saw this individual after Conley and after he had been put in the observation room, was given one critical piece of information that Ms. Conley was not aware of. And that was that Mr. Roster had a known history of drinking. I mean, I saw the record in that. It's just some comment of a correctional officer that he knew he did some drinking. Well, when you have a patient who you don't know. I mean, did they know that he had gone through detox and had problems before? No, and in fact, the saddest part of this case is a different... What was your indication? Somebody said that he had a couple beers on occasion? I'm sorry? I thought you made reference to the fact that he was known to have had a couple beers. No, that was not the comment of the deputy. The history that a couple beers was taken from the booking form from approximately two weeks prior to this admission. So that's a level of alcohol intoxication that would support alcohol withdrawal? A couple beers? No, sir, that's not what this is. This is a history given by a deputy to Mars that he was a known drinker. You have alcohol withdrawal symptoms. Known drinker, that runs the whole gamut, doesn't it? It does, but it's a piece of information that Mars didn't have. So that is why she also got on the phone and called Dr. Natoli. Now you're talking about Mars. That is correct. Mars was told by a correctional officer that... He was a drinker. He was a drinker, but no further info one way or the other. Mars sees the information in the record at that point in time of the first test of the CIWA. Plus Conley's information. She gets on the phone to Dr. Natoli, and what is omitted in plaintiff's brief repeatedly is Natoli said, I talked to her, she gave me the results of the CIWA, and she gave me the pertinent positives and other information. Dr. Natoli ordered the alcohol withdrawal protocol, and that includes thiamine and librium. And he remained in the observation cell, which I think you've seen the descriptions in the briefs. It's glassed in so that the individual can be seen, and it's monitored. Now Gomez, when he made the observation that Mr. Rouster appeared ill, that was not the first time when he saw him with Conley. That was the second night, unfortunately, after which Mr. Rouster died. Just in terms of the overall, you know at the time he goes in that when he's arrested, he's not showing any signs of either alcohol withdrawal or showing signs of other illness. I don't agree with that statement because the booking officer checked the box saying intoxicated. Which, where is that in the record? I believe that is as part of the jail medical record, and the name of the individual who did the initial intake is Lewis. It's also mentioned in the opinion of Judge Ludington. Do you have a docket number on that? I'm sorry, Your Honor, I do not. At some point in the analysis, we also take into deciding whether or not these defendants had facts from which they could draw an inference about the seriousness of this problem, and they drew it. At some point, we have to also talk about the inquiries of the decedent, asking him how do you feel, and I thought he brushed them off repeatedly about getting more attention, not a doctor's care, but are you okay, I'm fine, that kind of thing. He did indeed, and in fact, the statement that he was asking for medical care is incorrect. He never did. In fact, the only demand we know he made is kicking the door and demanding to go home. Are these features of the factual background important to the legal test about drawing the inference? I believe so because of the underlying, and I'm out of time, unfortunately. I may finish your answer. Thank you. Because of the underlying test for the subjective component requires more than misdiagnosis, which is what is going on in this case. It requires more than gross negligence. It rises to a higher level, which I don't believe was the case here. Thank you very much. Thank you, and I apologize if I spent all my time answering questions rather than making a cogent argument. We appreciate your answering questions. Good morning. Good morning. May it please the Court, Paul Vance appearing on behalf of Defendant Kathleen Conley only. At page 28 of my brief, I'm not going to recite it, but I point out all the affirmative steps Ms. Conley took in treating and caring for Mr. Rouster. I would note, I don't think it's been brought up yet, that at the time she performed her assessment in the medical unit of the jail and did her physical examination, she asked Mr. Rouster for any significant medical history and was given none. And that is very important because he did have a history, but at the time no one in the jail knew of that fact. Of course, that could be accounted for by the state of his distress, that he couldn't offer information like that. It could be. He thinks it's eight years earlier. He may not be able to say, oh, my medical history is thus. Well, the eight years comment was a separate comment during a CEWA, which was performed I believe on May 10, the following day. May 9 at 8.20 p.m. was the time of the initial assessment. But I believe that goes to whether or not Ms. Conley was negligent and is not evidence of deliberate indifference. So the May 9 at 8.20, the initial assessment, that's when he's complaining of abdominal pain? Correct. Okay. Was there any effort to get his medical history at any earlier time? That is the first time that he made a complaint of abdominal pain. Ms. Conley responded immediately to the call from the deputy, and thereafter they went to the medical unit. She performed her physical assessment, also attempted to take an oral history from Mr. Rouster at that point in time, based upon both her physical exam and her interaction with Mr. Rouster. She believed he had gas and diarrhea. He complained of some loose stool, and she provided him with medication, advised him to land his lesson. Medication meaning Tums, right? Yes, over-the-counter medication. But being specific, it was? It was Tums, correct, and instructed him to lay on his left side to help alleviate the discomfort. It's also? If I could just interrupt you for a second. She's an RMA. What kind of training did she have? Correct, a registered medical assistant. So she did attend some schooling and was licensed in the state of Michigan to serve as a medical assistant. Is this more or less training than an LPN? I believe it is a little less than an LPN and not particularly certain. But again, I think any argument that, well, she was doing something that a nurse should be doing, that's an argument that might be well found in a medical malpractice case. In fact, in plaintiff's reply brief in addressing the secure care liability claims, they indicate that Ms. Conley was making decisions outside of her ability, was inexperienced and confused. That's all medical malpractice. And then in the same breath they want to argue in the deliberate indifferent claim, well, that she basically ignored Mr. Rouster, which just isn't true according to the facts of the case. Their own expert, Nurse Tennyson, she testified that she did not believe there was any reason that Conley would have known or should have known of Rouster's medical condition, specifically the bleeding ulcer. She also testified that Ms. Conley was actually doing too much. She thought that she was doing more than would be expected of a registered medical assistant. And that speaks to the fact that she was not. This witness is an RN? Correct, this is their nurse. The expert, right, the plaintiff's expert. Correct. He's eating off the floor and drinking toilet water. Did she go to him then? She responded to each report, and when she arrived at the cell. By his cell? Yes, she went to the cell. After the toilet drinking? Yes. And there were two separate reports, if I believe. One was eating food off the floor, the next was the toilet drinking. Once she got the second call that he. . . The food on the floor, did she go to observe him then? Yes, she went three separate times to observe him. And each time she did not see anything personally herself. One of the times she went to check on him, she asked if he was still in pain or discomfort. He did not respond, and she testified, she took that to me, that the pain had resolved. But on the report of the drinking from the toilet, she then decided that he should be sent to the observation unit so he could be observed every 15 minutes to determine if he did, in fact, have some sort of mental status change. Did she do any of his vital measurements, either blood pressure or other testing typically done? She did not at the time she responded to the complaints of eating off the floor or drinking from the toilet. She testified that in those situations she can't go into a. . . By himself in this cell she's taken him to? No, there were other. . . The observation cell he was by himself. What record is there of how frequently she observed him while he was in there? It was not her responsibility to observe him. Did she go to it at all after she put him in there? In observation, she did not. She reported at the end of her shift to Nurse Mars. That's what, about seven hours later? I think five hours later was at the end of her shift. So she doesn't go and take a look at him after she's put him in there? No, the way the observation unit is is that it's in front of the deputy desk, a big window there, and the deputies are to observe, and they do checks every 15 minutes. They walk by and sign observe and then sign a sheet if everything appears to be. . . But there was also a privacy screen in the observational cell, is that right? For some reason I recall reading that there was a privacy screen and that the decedent was actually behind the privacy screen from time to time, which would prevent the deputies from seeing what was happening if that's the case. It's not a privacy screen. There is a, I would say, one-foot block, concrete, half a wall by the toilet. But the deputies were supposed to observe him every 15 minutes. I don't know. . . But they didn't observe, right? That is correct. But lied on the log. Correct. The fact of the matter is that Nurse Connolly did treat him. She did take affirmative steps to address what she believed his concerns or his issues were. She did not disregard him. In a recent case, Cobbs v. Pramstaller, which I believe Judge Cook was on, it said that deliberateness is tantamount to an intent to punish. There's really no evidence of this. The claims against Ms. Connolly really are dressed-up medical malpractice claims, which are in an attempt to claim that it's deliberate indifference, and I just don't think the evidence is there in this case. Thank you. Thank you. Just a couple of quick points. Judge Cook, to go to one of the points that you had hit on regarding Jerry Rouster's denials of any continuing abdominal pain, as Nurse Tennyson testified in this case, at the point that he's making those denials and indeed from the very point that he's drinking out of the toilet and eating off of the floor, he's already septic. His blood is infected because of his bleeding ulcer, and his brain isn't functioning correctly anymore. Obviously, as you know better than we even know, the issue is from the perception of the nurses. Indeed. Since they don't know, the question is whether they knew he was septic or should have known, right?  But it's interesting to me, Your Honor, that I'm not sure based on their arguments and based on their testimony what evidence would be enough, because when it comes to whether he's continuing to experience stomach pains, they say that because he said no, they believed him. Yet when he said, no, I'm not suffering from alcohol withdrawals, no, I don't have a drinking problem, no, I'm not intoxicated, they didn't believe that. They chose to believe some hearsay statement inside of the jail cell, an off-the-cuff remark that, oh, yeah, that guy's got a drinking problem. So it seems very inconsistent in terms of when they want to believe Jerry Rouster's words and when they don't want to believe Jerry Rouster's words. So I think that at a minimum, Your Honor, we say this in our brief as well, this isn't an instance where we moved for summary judgment and said that no jury could conclude that they did not know. We're simply saying that based on the circumstantial evidence here, based on the expert testimony, based on what they observed, based on what Officer Gomez testified, a reasonable jury could conclude that directly observing Jerry Rouster, an individual would conclude that something is going on that requires more than Tums. And there are symptoms here that aren't consistent with alcohol withdrawal. Judge Gwin, you had asked whether or not Conley had observed Jerry Rouster after she moved him to the observation cell, and counsel acknowledged that she did not. What's interesting about that is Conley stated that the very reason for moving him is because she couldn't accept the word of third parties. She couldn't accept that other people said, hey, this guy's acting strangely. She said, I needed to see it for myself, so I moved him to this observation cell. Yet it's so important that she sees it herself that she never even checks in on him. As the panel indicated, there was a partition inside the cell that Jerry Rouster was permitted to. Is it indeed to allow toilet privacy? Is it really a half wall? It's a half wall. I'm not sure whether or not it's situated next to the toilet or not. Regardless, a person's presence is observable if it's only a half wall. Well, if they're above it. The testimony was that he was laying on the floor concealed by it. And if it is, I see my time is up, but just to quickly address one more issue related to that question. If it is indeed situated next to the toilet, and if he's spending the majority of his time in that observation cell in that area, it would speak further to the idea that maybe he's continuing to have abdominal issues that necessitate follow-up. So, Your Honors, unless you have any other questions, I see my time is up. Thank you very much for your time today and your consideration. Thank you. Thank you for your argument. The case will be submitted.